UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR16-0007-RSM |
| Plaintiff, | ORDER DETERMINING LOSS AMOUNT, RESTITUTION AND OTHER SENTENCING ISSUES |
| v. | |
| LONNIE EUGENE LILLARD, NATHANIEL WELLS, MELISSA SANDERS, and ERIN TERRIL WILEY | |
| Defendants. | |

I.    INTRODUCTION

The defendants, Lonnie Eugene Lillard and Nathaniel Wells entered pleas of guilty to a single count indictment charging them with conspiring to commit bank fraud in violation of Title 18, United States Code, Sections 1344 and 1349. Dkt. 53 at 1-2. Two other co-defendants, Melissa Sanders and Erin Terril Wiley, were also charged in that same indictment and both of them also entered pleas of guilty. Ms. Sanders is awaiting sentencing while Mr. Wiley has already been sentenced. Mr. Lillard and Mr. Wells entered their guilty pleas without the benefit of a plea

agreement. Dkt. 112, 114. They stipulated to no facts relevant to sentencing except with respect to asset forfeiture. Both defendants Lillard and Wells contest the government's calculation of the loss amount, restitution and their specific role in the conspiracy. Accordingly, the Court held an extensive evidentiary hearing consisting of the testimony of several witnesses and thousands of pages of admitted exhibits from the government as well as from the defendants. This order resolves the outstanding sentencing issues for both Mr. Lillard and Mr. Wells.

In this case, based on the facts contained in the plea agreements and the presentence reports of co-defendants Wiley and Sanders, as well as the evidence presented during the evidentiary hearing, it's clear the object of this conspiracy was to obtain funds by using point-of-sale (POS) terminals reprogrammed with misappropriated merchant identification numbers without the authorization of the merchant. The co-defendants and unindicted co-conspirators, used the POS to process fraudulent refunds from merchants and load the funds onto debit cards, gift cards, and other instruments issued by banks and retailers. The defendants and co-defendants would then use these prepaid instruments to withdraw cash from various banks and automatic teller machines. In addition to withdrawing cash from banks and ATMs, the conspirators converted the credits to funds by using the fraudulently loaded cards to purchase money orders and precious metals, to buy goods and return them for cash, and through other means of converting the credits to cash.

To facilitate the scheme, the conspirators used a portable POS machine, a digital device that scans debit, credit, and gift cards, to process purchases and returns. POS terminals are typically found next to a merchant's cash register and are programmed with information unique to that merchant (merchant ID). To conduct a purchase or refund transaction, the card is "swiped" through the POS terminal which in turn transfers funds from the customer's account to the merchant

1   account during a purchase, or from the merchant to the customer account in the case of a return or

2   refund.

3      A merchant ID is a unique identifier assigned to a business or other entity to process debit and

4   credit transactions.  The merchant ID is programmed into a POS terminal to identify the associated

5   retailer or business to which the transactions should be associated. If a business has multiple

6   locations and retail outlets, there may be hundreds of merchant ID's associated with that business.

7   When there are multiple merchant ID's, it's a common practice to assign sequential merchant ID's

8   to the business's outlets. Some merchants print their merchant ID on customer receipts and

9   therefore, merchant ID's can be directly obtained or easily guessed.

10      During the course of the conspiracy, between July 2014 and January 5, 2016, the conspirators

11   used one or more reprogrammed POS devices to process fraudulent returns. As testified to by Ms.

12   Sanders and unindicted co-conspirator Mikah Quinn, defendant Lillard would travel to various

13   hotel or motel rooms and other locations, with a binder full of credit, debit, and gift cards, and

14   program the POS terminals to process numerous fraudulent returns, often for hours at a single

15   location. This fraudulent activity created three categories of victims; individual merchant retailers,

16   credit processing companies, and individual banks.

17      The Court heard the testimony of several law enforcement witnesses including;

18     1.  Kevin Brennan, F.B.I. Special Agent in charge of this case,

19     2.  Derek Hill, F.B.I. Task Force member,

20     3.  Kiersten Rogowski, F.B.I. Special Agent,

21     4.  Brian Snead, F.B.I. Forensic Accountant, and

22     5.  Keith Evans, Bureau of Prisons, Intel Operations Specialist.

23

24

Additionally, two civilian witnesses testified, codefendant Melissa Sanders and unindicted co-conspirator Mikah Quinn. The defendants declined to testify and did not call any witnesses.

While each of the witnesses was cross examined, often extensively by the defense, there was no conflicting or contradictory evidence raised by cross examination that the Court finds material to deciding the issues of loss amount, restitution or role in the offense. The Court thereby fully credits the testimony of each of the witnesses, finding it to be truthful and credible. The Court references specific testimony of a particular witness where appropriate in this order.

## II.    SENTENCING ISSUES

### A.    Loss Amount

The United States Sentencing Guidelines provides that a conviction for Conspiracy to Commit Bank Fraud has a base offense level of seven. USSG § 2B1.1. Additionally, the Guidelines provide for an upward adjustment to the base offense level if the amount of loss exceeds $6,500; the amount of the upward adjustment depends on the amount of the loss. USSG § 2B1.1(b)(1). In determining the loss amount, the Court is to determine the greater of actual loss or intended loss. "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense. "Intended loss" is the pecuniary harm that the defendant sought to inflict even if it includes harm that would have been impossible or unlikely to occur.

In determining the loss amount the Court need not be exact, but may make a reasonable estimate of the loss. USSG § 2B1.1, cmt. 3(C). And, when calculating loss amount in a case where the defendant participated in jointly undertaken criminal activity such as a conspiracy, the Court is to consider all acts of others that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity," whether the acts occurred during, in preparation for, or in attempting to avoid

detection or responsibility for the offense. USSG § 1B1.3(a)(1)(B). In making its calculation the Court is free to consider all relevant factors such as the approximate number of victims, the average loss per victim, the scope and duration of the offense, and the revenues generated by other conduct. USSG § 2B1.1, cmt. 3(C). Further, where unauthorized access devices are involved, loss can also be calculated per access device, in an amount no less than $500 each. USSG § 2B1.1, cmt. 3(F)(i).

The victims of this conspiracy were credit processors (payment processors), banks and individual merchants. In calculating the loss amount the Court is mandated that it must never "double count" any specific loss. The Court thereby proceeds cautiously, and conservatively, when examining the government's evidence of actual or intended loss. The testimony showed that the five individual payment processing companies shouldered the vast bulk of the losses from this scheme by making the majority of individual retailers, who utilized that specific payment processor for their transactions, whole after discovering the fraud. Some of these payment processors are wholly owned by other financial institutions. For example, Chase Paymentech is a wholly owned subsidiary of JP Morgan Chase. However, for purposes of this order, the corporate structure is not relevant and the Court will refer to these five institutions as payment processors. Therefore, although there was testimony that some individual merchant retailers also suffered losses and some failed to report some of their losses, in calculating loss amounts the Court focuses on those five payment processors, Vantiv, Chase Paymentech, First Data, Green Dot, and INCOMM, as the most impacted victims.

### 1.  Actual and Intended Loss

a.  Vantiv

Vantiv is a payment processor that fell victim to the scheme of this conspiracy. Vantiv provided five spreadsheets setting out each of the transactions, both successful and unsuccessful, that

were determined by Vantiv to have occurred as a result of activity by these conspirators during the relevant time frame. In reviewing the testimony as well as the exhibits received in evidence during the hearing, the Court's primary concern was that the government bore the burden of establishing that the claimed victim losses were, in fact attributable to the actions of the conspirators and that there was no "double counting" of potential loss amounts. The Court is satisfied that the government has successfully met that burden by a preponderance of the evidence.

Documents recovered from a search of defendant Lillard's apartment show the dial up number utilized to make these transactions to Vantiv. Within those documents were numerous receipts containing merchant numbers from merchants victimized during the relevant period and for whom Vantiv was the payment processor. Also recovered from defendant Lillard's apartment were access devices (credit, debit or gift cards) that were repeatedly fraudulently loaded throughout the relevant period. Defendant Wells had fraudulent credit cards in his name that were recovered from a search of his wallet that were loaded repeatedly during this time frame with funds directly tied to the data supplied by Vantiv regarding the losses suffered. The primary victim merchant was Hometown Buffet and Old Country Buffet. This victim was specifically mentioned by Melissa Sanders during her testimony as one of particular interest to defendant Lillard.

The same pattern of activity is repeated over and over with the same merchant numbers being used, often within a very short time frame of one or two days, to fraudulently load thousands of dollars onto the cards and then try to cash them out as quickly as possible. Exhibit 9 was a red notebook recovered from defendant Well's apartment that had pages and pages of card numbers and dates that matched up to the spreadsheets provided by Vantiv. That

1    same notebook also assigned certain card numbers to defendant Lillard as well as codefendant

2    Wiley that were used to load cards multiple times. There were photos admitted that showed

3    multiple individuals, including defendant Lillard, codefendant Erin Wiley and other unindicted

4    co-conspirators, using these fraudulently loaded cards to obtain cash.

5        Additionally, there were text messages from other unindicted co-conspirators to defendant

6    Wells about reloading specific cards that were later identified as used to defraud Vantiv. There

7    were text messages from defendant Lillard to another unidentified individual that identified

8    specific merchants victimized during this time frame from Vantiv's spreadsheets. There was

9    evidence that a number of fraudulent loads were made from a specific internet address

10   belonging to defendant Wells. And, there were numerous receipts recovered from defendant

11   Wells' apartment reflecting almost $2500 being spent for sneakers on a single day paid for with

12   gift cards fraudulently loaded on the exact same date. The evidence is overwhelming that the

13   actual and intended losses identified by Vantiv in their spreadsheets are attributable to the

14   conspiracy in this case.

15       The Court is satisfied that the evidence presented supports the government's contention that

16   the five spreadsheets accurately reflect a combination of actual and intended loss to Vantiv of

17   $2,759,835.

18   b.  Chase Paymental/ Paymentech LLC (Chase)

19   Chase Paymentech, also referred to in the exhibits as Paymentech LLC, is a payment processing

20   institution that allows merchant-clients to accept credit, debit, and gift cards as payment for goods

21   and services. Chase provides its merchants with POS terminals to allow these transactions to occur.

22   From July 8, 2014 through October 23, 2015, Chase identified 1,211 fraudulent transactions

23

24

involving 551 merchant identification numbers belonging primarily to five individual merchants, Michaels, See's Candies, Quiznos, Superpawn, and Cash American Pawn.

Exhibits 18 and 19 were spreadsheets submitted by Chase. These exhibits support Chase's contention that during the period of July 7, 2014 through October 23, 2015 there were 2,199 transactions involving fraudulent activity attributable to this conspiracy.  During that time three POS terminals were utilized along with 551 separate merchant IDs. In the majority of successful transactions Chase bore the loss but, there were 31 individual merchants identified by Chase who ultimately bore the loss themselves.

Once again, numerous items of evidence tied Chase's identified actual and intended loss to the conspiracy in this case and defendants Lillard and Wells. A number of dial up transactions were made from hotel rooms where an identified member of the conspiracy had rented or was staying in the room. For example, defendant Erin Wiley had rented a room at the Crowne Plaza on July 7, 2014. The transactions made from that room all involved the same POS terminal. That exact POS machine was found in a search of a storage locker tied to the defendants. That single POS machine was identified as responsible for $749,000 of fraud against Chase. Other transactions were conducted from a hotel room rented by codefendant Melissa Sanders at the Comfort Inn. That same card was fraudulently loaded multiple times from different hotel rooms on different days. And, as seen before with Vantic, the same pattern of loading multiple cards using the same merchant identification numbers is repeated multiple times over a period of months. Also, within the red and blue notebooks found at defendant Wells' apartment can be found the card numbers that were utilized to defraud Chase.

The evidence is overwhelming that the actual and intended loss amounts indicated by Chase in their spreadsheets were the results of the conduct by members of this conspiracy including

defendants Lillard and Wells during the relevant time frame. The Court is satisfied that the government has met its burden to show that these defendants were involved in the loss amounts identified by Chase. The Court finds that the evidence presented supports the total amount of actual loss and intended loss for Chase as $1,336,807.

c.  First Data

Exhibit 25 is a spreadsheet from payment processer First Data indicating fraudulent transactions occurring from July 22, 2015, through December 31, 2015. There are 3,698 fraudulent loads targeting 633 merchant identification numbers. As with Chase and Vantic, documents recovered from defendant Lillard and defendant Wells' list card numbers that were targeted in this conspiracy and identified by First Data. Exhibit 2, a document that came from defendant Lillard's apartment, lists cards that were assigned to "Nate" and to "Lonnie". The Court is satisfied that "Nate" and "Lonnie" refer to defendants Wells and Lillard. The cards listed on a single page of the multipage document assigned to "Lonnie" were used in 133 separate transactions resulting in $64,000 of fraudulent loads between November 20 and December 11, 2015. One of these cards was physically recovered from defendant Lillard's apartment. The Court is satisfied that the fraudulent transactions identified by First Data were the result of conduct by the members of this conspiracy including defendants Wells and Lillard. The Court finds that the evidence presented shows actual and intended loss to First Data of $1,252,794.

d.  Green Dot

Exhibits 29 and 30 are two spreadsheets from payment processor Green Dot. Green Dot, instead of setting out the card numbers utilized during the transactions, assigns a unique identifier that correlates with each card number. These exhibits reflect a total of 2,054 transactions from May 16 through July 1, 2015. Seventy one unique merchant identification numbers were targeted using 75

fraudulent Walmart Visa gift cards. These gift cards were capable of being registered to an individual's name and address. Three of these cards were actually registered to defendant Wells using email addresses known to belong to him and associated with his residential address. Another card was registered to codefendant Erin Wiley. A number of cards were registered to a specific address at 300 Garden Avenue North that law enforcement surveillance had linked to defendant Lillard. Other cards were registered to other unindicted, but identified members of this conspiracy including Mikah Quinn. Additionally, also connecting these transactions to these defendants, some of the transactions listed by Green Dot were purchases made through the website silver.com. Precious metals were recovered in a search of a storage locker associated with Lillard and Wells.

Defendant Lillard's cell phone was searched and a series of text messages were discovered sent by defendant Lillard to an individual named Joe Marcus. That name had also been listed in one of the notebooks discussed earlier. In those texts defendant Lillard is telling Marcus to go out and buy two visa gift cards from Walmart, which were exactly the type of gift cards identified by Green Dot as set out their spreadsheets. And, just two hours after that text is sent, the first two transactions that occur were completed utilizing a Walmart gift card. Lillard's texts also coincide perfectly with the time frames set out in the spreadsheets including a lull without any fraudulent activity for ten days. Lillard texted an individual named "Dame" on June 1, 2015 stating "nothing is going on right now obviously no money has been made in over 10 days". In fact, defendant Lillard's numerous texts provide substantial corroboration of the conspiracy's overall scheme involving many of the victim merchants and payment processers.

The Court is satisfied that the transactions listed in the two spreadsheets by Green Dot were the product of this conspiracy and finds that the amount of actual loss and intended loss for this payment processer were $741,624.

e.  INCOMM

Exhibit 32 is a spreadsheet from payment processor INCOMM. This exhibit lists fraudulent transactions occurring from May 18, 2015, through April 20, 2015, and targeting four primary victim merchants involving 3,633 fraudulent loads. Again, the evidence supports the fact that all of these transactions were the product of this conspiracy.  For example, a document recovered from defendant Lillard's apartment lists one of the four victim merchants, Paulina Hair Salon in Jonesboro Arkansas.  This victim merchant alone had $593,000 in fraudulent transactions during this time frame. Exhibit 114, a document recovered from the storage locker associated with these defendants, listed numerous card numbers and associated dollar values that were identical to those identified in the INCOMM spreadsheets. There were specific card numbers that had been loaded previously involving other payment processors being utilized once again and connected directly to members of this conspiracy, including codefendant Wiley and defendant Wells. There was evidence of spend activity from fraudulent transactions going directly to a business called "Nathaniel Wells" as a way of simply transferring funds from a loaded card to defendant Wells' possession. Another document, defendant Wells' personal bank account, reflects this influx of cash.  Exhibit 33 sets out 73 of the transactions listed by INCOMM as going to a company called "Nathaniel Wells" reflecting a total of $36,000 ending up in defendant Wells' personal bank account.

Based on all of the evidence, the Court is satisfied that INCOMM suffered losses from the fraudulent activity by this conspiracy and these defendants.  The Court finds that the total amount of actual loss and intended loss for INCOMM is $1,585,813.

The government argues extensively that the Court, in calculating intended loss, should consider the full scope and nature of the scheme and some of the less concrete or less defined numbers in

1   order to reach a reasonable estimate of intended loss that is not captured by the data in the

2   spreadsheets.  For example, the government contends that the Court can look at the number of

3   access devices (cards) that were recovered and simply assign a reasonable value of intended loss

4   to each card based on how much money was loaded onto the cards that were actually utilized in

5   fraudulent transactions. The government also argues that the documents and other materials found

6   in defendant Lillard's jail cell prior to his release indicate that he anticipated being able to defraud

7   victims up to $32 million dollars per day. And, while this was obviously outlandish and fanciful

8   on its face, it shows the grand scope and scale of the scheme he was preparing to unleash. The

9   government also argues that based on the forensic examination of the financial information here

10  it's obvious that not all transactions committed by the conspirators have been identified and there

11  must be many more fraudulent transactions, successful or not, that have not been discovered or

12  even reported to law enforcement authorities.  While these arguments certainly have substantial

13  merit, the Court declines to speculate any further and will use the loss amounts previously set out

14  above as the total of actual and intended loss. That total loss amount for all five payment processors

15  is, therefore, $7,676,873.

16              2.  Restitution

17      The Mandatory Victims Restitution Act requires a sentencing court to order full restitution to

18  each victim harmed by the commission of the offense. 18 U.S.C § 3663A(a)(1). Bank Fraud and

19  Conspiracy to Commit Bank Fraud are qualifying offenses. A "victim" is defined as anyone

20  "directly and proximately harmed as a result of the commission of [the] offense" including where

21  the crime includes a scheme or conspiracy. 18 U.S.C § 3663A(a)(2). Additionally, the court is

22  directed to "order restitution to each victim in the full amount of each victim's losses", irrespective

23  of the defendant's ability to pay.

24

Based on all of the evidence presented and as set out in this order, the Court finds that both defendants Lillard and Wells were deeply involved in an extensive conspiracy to defraud numerous victims out of millions of dollars. Both defendants Lillard and Wells participated in that jointly undertaken criminal activity fully aware of, and acting to further the scope of, that activity. Therefore, the Court will impose joint and several liability for the total amount of actual losses sustained by the victims of the entire conspiracy.  Since the government is still in the process of gathering all of the victim information necessary, the exact amount of restitution to specific victims will be determined at sentencing. However, in order to help the party's preparation, the Court accepts the partial restitution amounts as set out by the government in their Brief for Evidentiary Hearing. Dkt. 133.

### 3.   Sentencing Guideline Computations

**A.  Lonnie Lillard**

**a.  Base Offense Level:**

The guideline for Conspiracy to Commit Bank Fraud is found in USSG § 2B1.1. That section provides that an offense of conviction which has a statutory maximum term of imprisonment of 20 years or more has a base offense level of seven.

**b.  Specific Offense Characteristics:**

1.  Loss Amount

As the Court has determined the intended loss amount here to be $7,676,873 but less than $9,500,000, an 18-level increase is applied. USSG § 2B1.1(b)(1)(K).

2.  Number of Victims

A two level increase is applied as the Court finds that there were more than 10 victims of this conspiracy.  USSG § 2B1.1(b)(2)(a)(i).

3.  Sophisticated Means

If the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, a two level increase is applied. USSG § 2B1.1(b)(10)(C). In this case, the Court finds that the defendant was the leader of a large scale conspiracy that committed the offense by gaining control over POS machines and merchant identification numbers. The defendant re-programmed the POS machines with the merchant identification numbers, allowing the conspirators to process transactions as if they were the victimized merchant. They processed thousands of fraudulent refund/return transactions loading credits onto credit, debit, and gift cards and then converting those credits to cash. The process was complex, and the steps taken were divided among many participants in order to hinder detection. A two level increase is applied.

4.  Device Making Equipment

If the offense involved (A) the possession or use of any (i) device making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature, or (C) (i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, then a two level increase should apply. USSG § 2B1.1(b)(11).  Device making equipment is further defined as "any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device."  In this case, the Court finds that a reader writer device was recovered from defendant Lillard's apartment. This device

can be used both to read the magnetic stripe on the back of a card and to encode data onto the magnetic stripe including the card number. There was evidence presented through the testimony of codefendant Sanders and unindicted co-conspirator Quinn, that Lillard used that device to change card numbers. There was also evidence that an embosser, used to change the raised or embossed information on the front of a card was used as cards were recovered that had the names of the co-conspirators embossed on the front, even though these particular types of cards would not have been issued in a particular name. Therefore, a two level increase is applied.

5. Role In The Offense

If the defendant was an organizer or leader of a criminal activity that involved 5 or more participants or was otherwise extensive, a four level increase is applied. USSG § 3B1.1(a). In this case, the Court finds that there were more than five participants and that the evidence is overwhelming that defendant Lillard was the leader and driving force of this criminal conspiracy. As set out above, the conspiracy was extensive, with dozens of participants carrying out a very complex scheme lasting over 18 months and involving hundreds of victim merchants, thousands of fraudulent transactions, and millions of dollars of loss. Both Sanders and Quinn credibly testified that Lillard was the leader. Lillard has a prior conviction for committing an identical offense, even involving one of the same victims in this case. The documents recovered from his cell show that he was planning this offense for years while in custody and the criminal activity in this case began within five weeks of his release from prison. Lillard's apartment was completely filled with documents and instrumentalities of the crime. Therefore, a four level increase is applied.

6.  Acceptance of Responsibility

A two level decrease is applied if the defendant demonstrates that he has accepted responsibility for the offense.  USSG § 3E1.1(a). The government argues that putting the government through an extensive evidentiary hearing shows that the defendant has not accepted responsibility. However, the Court finds that the defendant admitted guilt and, in this case, simply contesting the sentencing issues discussed in this order does not equal non acceptance of responsibility.  Therefore, a two level decrease is applied.

The total offense level for Lonnie Lillard is set at 33. If his criminal history category falls at a VI, the operative guideline range the Court will be using at sentencing will be 235 to 293 months.

**B.  Nathaniel Wells**

**a.  Base Offense Level:**

The guideline for Conspiracy to Commit Bank Fraud is found in USSG § 2B1.1. That section provides that an offense of conviction which has a statutory maximum term of imprisonment of 20 years or more has a base offense level of seven.

**b.  Specific Offense Characteristics:**

1.  Loss Amount

As the Court has determined the intended loss amount here to be $7,676,873 but less than $9,500,000, an 18-level increase is applied. USSG § 2B1.1(b)(1)(K).

2.  Number of Victims

A two level increase is applied as the Court finds that there were more than 10 victims of this conspiracy.  USSG § 2B1.1(b)(2)(a)(i).

3.  Sophisticated Means

1    If the offense otherwise involved sophisticated means and the defendant intentionally

2    engaged in or caused the conduct constituting sophisticated means, a two level increase is

3    applied. USSG § 2B1.1(b)(10)(C). In this case, the Court finds that the defendants were

4    involved in a large scale conspiracy that committed the offense by gaining control over POS

5    machines and merchant identification numbers. The leader of the conspiracy, Lonnie

6    Lillard, re-programmed the POS machines with the merchant identification numbers,

7    allowing the conspirators to process transactions as if they were the victimized merchant.

8    They processed thousands of fraudulent refund/return transactions loading credits onto

9    credit, debit, and gift cards and then converting those credits to cash. The process was

10   complex, and the steps taken were divided among many participants in order to hinder

11   detection. A two level increase is applied.

12   4.   Device Making Equipment

13   If the offense involved (A) the possession or use of any (i) device making equipment, or (ii)

14   authentication feature; (B) the production or trafficking of any (i) unauthorized access

15   device or counterfeit access device, or (ii) authentication feature, or (C) (i) the unauthorized

16   transfer or use of any means of identification unlawfully to produce or obtain any other

17   means of identification, or (ii) the possession of 5 or more means of identification that

18   unlawfully were produced from, or obtained by the use of, another means of identification,

19   then a two level increase should apply. USSG § 2B1.1(b)(11). Device making equipment

20   is further defined as "any equipment, mechanism, or impression designed or primarily used

21   for making an access device or a counterfeit access device." In this case, the Court finds

22   that a reader writer device was recovered from defendant Lillard's apartment. This device

23   can be used both to read the magnetic stripe on the back of a card and to encode data onto

24

1    the magnetic stripe including the card number. There was evidence presented through the

2    testimony of codefendant Sanders and unindicted co-conspirator Quinn, that Lillard used

3    that device to change card numbers. There was also evidence that an embosser, used to

4    change the raised or embossed information on the front of a card was used as cards were

5    recovered that had the names of the coconspirators embossed on the front, even though

6    these particular types of cards would not have been issued in a particular name. Therefore,

7    a two level increase is applied.

8    5.    Role In The Offense

9    If the defendant was a manager or supervisor of a criminal activity that involved 5 or more

10    participants or was otherwise extensive, a three level increase is applied. USSG § 3B1.1(a).

11    In this case, the Court finds that the conspiracy was extensive, with dozens of participants

12    carrying out a very complex scheme lasting over 18 months and involving hundreds of

13    victim merchants, thousands of fraudulent transactions, and millions of dollars of loss.

14    Although Lillard was the obvious leader, defendant Wells was his second in command as

15    confirmed by Melissa Sanders and the thousands of exchanged texts and phone calls

16    between Lillard and Wells. The evidence found in the search of Wells' home establishes

17    his position in the conspiracy as being much more than simply another runner. Found at his

18    residence were dozens of credit, debit, and gift cards; a POS machine; key cards to hotels

19    where the fraudulent transactions were carried out; receipt spools and receipts; as well as

20    handwritten ledgers documenting how to conduct the scheme and advance the fraud. The

21    Court is satisfied that defendant Wells was, at least, a manger of this criminal conspiracy.

22    Therefore, a three level increase is applied.

23

24

6.  Acceptance of Responsibility

A two level decrease is applied if the defendant demonstrates that he has accepted responsibility for the offense.  USSG § 3E1.1(a). The government argues that putting the government through an extensive evidentiary hearing shows that the defendant has not accepted responsibility. However, the Court finds that, in this case, the defendant admitted guilt and simply contesting the sentencing issues discussed in this order does not equal non acceptance of responsibility.  Therefore, a two level decrease is applied.

The total offense level for Nathaniel Wells is set at 30. If his criminal history category falls at a VI, the operative guideline range the Court will be using at sentencing will be 168 to 210 months.

III.    CONCLUSION

Having determined the outstanding issues as set out above, the Court will set the sentencing hearings for Defendant Lillard on March 30, 2018 at 9:30am, Defendant Wells on March 30, 2018 at 10:00am and Defendant Sanders on March 30, 2018 at 10:30am.  The clerk will send a copy of this order to all counsel of record and to Pro Se Defendant Lillard at FDC Sea-Tac.

Dated this 2 day of March 2018.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE